CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
9/30/19

JULIA C. DUDLEY, CLERK
BY: K. Dotson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| ANDREW W., | ) | |
|     Plaintiff, | ) | Civil Action No. 5:18-cv-00040 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| ANDREW M. SAUL, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) |        United States Magistrate Judge |
|     Defendant.[1] | ) | |

Plaintiff Andrew W.[2] asks the Court to review the Commissioner of Social Security's final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF Nos. 8, 9. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, the decision will be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her

2

residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

II. Procedural History

In August 2014, Andrew filed for DIB alleging that he had been disabled since February 15, 2013, because of "unpredictable" physical pain and psychiatric disorders including anxiety, depression, attention deficit disorder, osmophobia, and obsessive-compulsive disorder. *See* Administrative Record ("R.") 18, 88, 177–80, ECF No. 12. He later amended his alleged onset date ("AOD") to March 1, 2011, the same date he was in a serious car accident. R. 47. Andrew was thirty years old, or a "younger person" under the regulations, on that date. R. 20, 34; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied his claim initially in January 2015, R. 88–101, and upon reconsideration that July, R. 102–16. In September 2016, Andrew appeared with counsel and testified at an administrative hearing before ALJ Mark O'Hara. R. 41–87. A vocational expert ("VE") also testified at this hearing. R. 74–85.

ALJ O'Hara issued an unfavorable decision on January 9, 2017. R. 18–36. He found that Andrew had performed work activity since March 2011, but not "at the substantial gainful activity" level. R. 20. Andrew met the Act's insured-status requirements through March 31, 2014.[4] *Id.* At step two, ALJ O'Hara found that Andrew "had the following questionably severe

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[4] This date is called the claimant's date last insured, or "DLI." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Andrew had to "prove that []he became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656.

impairments" during the relevant time: "anxiety and affective disorders, multiple fractures status-post [the] March 1, 2011 motor vehicle accident with right ankle pain, and myofascial neck and back pain." *Id.* All other "medical conditions found in the record, alone or in combination," were either non-severe or not medically determinable. R. 21. Andrew's severe impairments did not meet or medically equal the relevant listings. R. 21–23 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.06, 12.04, 12.06 (2016)).

ALJ O'Hara then evaluated Andrew's residual functional capacity ("RFC") as it existed before March 31, 2014. R. 23–34. Physically, Andrew could have performed medium work[5] that involved "occasional[ly] climbing ladders/ropes/scaffolds, balancing without limitation," and doing other postural activities "no more than frequently." R. 24. Mentally, Andrew "retained the concentration, persistence, and pace to perform simple repetitive tasks that [did] not require working with the public" and involved "working with things" more than people. *Id.* The limitation to simple work ruled out Andrew's return to his past relevant work as an engineer. R. 34; *see* R. 35–36, 80–82. Finally, based on this RFC finding and the VE's testimony, ALJ O'Hara concluded at step five that Andrew was not disabled between March 1, 2011, and March 31, 2014, because he could have performed several unskilled occupations (e.g., janitor/cleaner, order picker, office helper, laundry aide) that offered a significant number of jobs in Virginia and nationwide. R. 35–36; *see* R. 82–85. The Appeals Council denied Andrew's request for review, R. 1–3, and this appeal followed.

III. Discussion

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c); *see* R. 23–24. "In most medium jobs, being on one's feet for most of the workday is critical." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). The "full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday," usually while lifting or carrying objects weighing up to 25 pounds. *Id.* "[S]itting may occur intermittently during the remaining" two hours. *Id.*; *see* R. 23–24.

Andrew's sole argument on appeal challenges ALJ O'Hara's finding that Andrew's severe anxiety and affective disorders did not meet Listing 12.06. *See* Pl.'s Br. 2, 5–11, ECF No. 14. The Listings are examples of medical conditions that "ordinarily prevent a person from working" in any capacity. *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990) (quotation marks omitted). If a claimant's severe impairment(s) "satisfies *all* of the criteria of [the corresponding] listing, including any relevant criteria in the introduction," 20 C.F.R. § 404.1525(c)(3) (emphasis added), then the claimant is "entitled to a conclusive presumption" that he or she is disabled, *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)). *See Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). To make this determination, the ALJ must identify the relevant listed impairment(s) and "compare[] each of the listed criteria" to the evidence in the claimant's record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

ALJ O'Hara considered whether Andrew's mental impairments met Listing 12.06, "Anxiety-related disorders."[6] R. 20–23, 27–34. That listing is broken into three "paragraphs," or parts, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06(A)–(C) (2016), and in this case Andrew had to "present[] evidence of both parts A and B" to prevail, *McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002). *See* Def.'s Br. 10 n.7, ECF No. 16. Part A required "medically documented findings" that Andrew exhibited at least one of five listed "persistent" or "recurrent" psychiatric

---

[6] Andrew mistakenly relies on Listing 12.06(B)'s current language, Pl.'s Br. 6–11, which ALJs will use "[f]or claims filed on or after January 17, 2017," *Kamplain v. Berryhill*, No. 5:17cv180, 2019 WL 636989, at *3 n.4 (W.D.N.C. Feb. 14, 2019). "[T]he new Paragraph B criteria include: 'Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.'" *Id.* (quoting 20 C.F.R. § 404.1520a(c)(3) (as amended)). ALJ O'Hara correctly used the version of Listing 12.06(B) that was in effect on January 9, 2017, R. 22–23, 36. *See Kamplain*, 2019 WL 636989, at *3 n.4.

disorders and accompanying symptoms.[7] 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06(A)(1)–(5). Part B required evidence that the impairment caused "marked" limitations in at least two of three broad functional areas: activities of daily living; social functioning; and concentration, persistence, or pace. *Id.* § 12.06(B)(1)–(3). A "marked" limitation means "more than moderate but less than extreme" difficulty in a functional area. *Id.* § 12.00(C). Andrew could have had a "marked limitation . . . when several activities or functions [were] impaired, or even when one [was] impaired, so long as the degree of limitation . . . interfere[d] seriously with [his] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* In making this determination, ALJ O'Hara was required to "consider all relevant evidence in [the] case record," *id.* § 12.00(D), including medical opinions, findings on mental-status exams, Andrew's subjective statements, information about unsuccessful work attempts, *id.* § 12.00(D)(1)–(5), and, importantly, any descriptions of Andrew's "typical reaction" to stress, *id.* § 12.00(D)(11).

Andrew argues that the medical evidence of record shows he had "at least marked limitation" in social functioning and maintaining concentration, persistence, or pace. *See* Pl.'s Br. 6. That question—whether Andrew was disabled during the relevant time—is for the Commissioner to decide. The fundamental question before the Court is whether the ALJ's conclusion that Andrew was "not disabled is supported by substantial evidence and was reached

---

[7] "Symptoms" are the claimant's own description of his medical impairment. 20 C.F.R. § 416.928(a). The regulations set out a two-step process for ALJs to evaluate symptoms. *See Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability" to perform work activities. *Id.* "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Id.*; *see Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640.

based upon a correct application of the relevant law." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). On that issue, Andrew points to specific medical records dated between February 2013 and July 2016 that he believes the ALJ misinterpreted. *See* Pl.'s Br. 3–11. His objection exposes a clear legal error: ALJ O'Hara did not properly consider any of Andrew's mental-health treatment records dated after April 1, 2014. *See Bird*, 699 F.3d at 340–42.

To qualify for DIB, Andrew had to "prove that []he became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656. "Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird*, 699 F.3d at 340. Indeed, later-created evidence that "permits an inference of linkage between the claimant's post-DLI state of health and [his] or her pre-DLI condition[] could be the most cogent proof of a claimant's pre-DLI disability." *Id.* (quotation marks omitted). "[R]etrospective consideration of [such] evidence is appropriate when the record is not so persuasive as to rule out any linkage" of the claimant's "final condition . . . with his earlier symptoms." *Id.* (quotation marks omitted). Thus, the ALJ must at least "review the evidence for linkage." *Parker v. Berryhill*, 733 F. App'x 684, 687 (4th Cir. 2018) (citing *Bird*, 699 F.3d at 340–41). If a link exists, then the evidence is "relevant" to the pre-DLI disability determination and the ALJ must consider it as he would any other relevant evidence in the claimant's record. *See id.*; *Bird*, 699 F.3d at 340–41.

A.   *Summary*

Andrew provided the following information in his written statements to the state agency and his testimony at the administrative hearing. Andrew was diagnosed with anxiety and obsessive-compulsive disorder ("OCD") in childhood. *See* R. 245 (Apr. 2015). Some of his symptoms "got worse in adulthood, but with much effort [he] controlled it enough to function

7

reasonably well," *id.*, while also working, going to college, or both, *see* R. 49–51 (Sept. 2016). By March 2011, he "felt like [he] was doing really good" and "had finally hit a stride," R. 51, working full-time as an energy engineer, R. 204. *See also* R. 222 (Nov. 2014). On March 1, Andrew's car was struck head-on while he was driving to work. R. 222. Andrew suffered serious physical injuries requiring multiple surgeries and chronic pain medication. He tried to go back to work a few times, but his neck and back pain was too severe. *See* R. 53–54, 242, 281–84.

The accident also exacerbated Andrew's underlying anxiety disorders. R. 222, 242. "[P]anic/anxiety attacks" forced him stop working again in February 2013. R. 222. By April 2015, Andrew had decided "engineering was too stressful" and he "need[ed] to switch to a less stressful career." R. 245. He had a "hard time" going out in public because "the smells and noises" invaded his senses. R. 246; *see also* R. 56–60, 285–87 (Sept. 2016). Being home alone "allowed [his] mind to wander to upsetting and obsessive thoughts," which he described as "often overwhelming/unsettling[,] unreasonable fear/anxiety [and] shaking/curled up feeling." *Id.* Everything felt "overwhelming except for occasional, unpredictable periods of glorious uninhibited productivity." *Id.* He took escitalopram (Lexapro) for anxiety, OCD, and "acute severe depression." R. 252. He was prescribed Xanax for acute severe anxiety, but used it "sparingly to avoid . . . potential[]" dizziness and severe tinnitus. *Id.*; *see also* R. 59–60.

\*

Most of Andrew's medical records relate to his physical impairments and pain after the car crash. *See generally* R. 306–26, 348–435, 575–620. A few of those treatment notes contain evidence of Andrew's psychiatric disorders, symptoms, or alleged limitations. In September 2012, Andrew told Morton Fishman, M.D., that he had been treated for ADD and OCD beginning "in grade school." R. 325. "He had some reprieve of symptoms in high school and stopped taking all . . . of his psychiatric meds." *Id.* By early 2004, he "started to feel out of

8

control" and "was placed back on treatment for OCD," anxiety, and "significant bouts of depression." *Id.* "He got through school, with much effort, but . . . had periods of rage and violence." *Id.* A few years later, Andrew "could not keep it all together. He could not get out of bed to get to work on time [and] was too fatigued to complete a 40hr work week." *Id.* In 2009, he "finally" restarted Lexapro and Ritalin "to help him manage his life." He continued Lexapro, but he "still struggl[ed] with short term memory." *Id.* "[T]hings were manageable" until March 2011, when he was in a life-threatening car accident. *Id.* In 2012–2013, Andrew told Dr. Fishman that he suffered "marked sleep impairment, mood swings, depression, difficulty falling asleep, anxiety, panic attacks, poor memory, difficulty concentrating, [and] some word finding issues." R. 321, 323, 325. Andrew occasionally told other providers who treated him for his physical impairments that he felt anxious, depressed, or emotionally drained. *See* R. 359, 365, 383, 387, 415. *But see* R. 372, 395, 408, 427, 431 ("Psychiatric/Behavioral: Negative."). Their relevant exam findings (if any) were normal. R. 366, 380, 397.

The record also contains treatment notes from Andrew's long-time treating psychiatrist, Thomas Jayne, M.D., and his psychotherapist, Carolyn Marion, M.A., Ed.S., whom Andrew started seeing about six months after his DLI, R. 30, 532. *See generally* R. 450–570, 621–711. Andrew established care with Dr. Jayne on October 15, 2010. R. 445, 450–53. He reported OCD symptoms (smell sensitivity, rituals, obsessive negative thoughts) dating back to the late 1990s. R. 450. Since mid-2009, Andrew had lived with "major stress" trying to work full-time while "finishing [his] delayed senior project." *Id.* Fatigue, anxiety, and "poor concentration," R. 452, made it "[v]ery hard to get through the day," R. 450. Andrew's physical anxiety symptoms included vigilance and pacing, but not panic attacks. R. 450, 452. On exam, Dr. Jayne observed Andrew was "cooperative," but appeared "agitated," depressed, and anxious. R. 452. The rest of

9

the detailed exam was normal. *Id.* ("intact" abstraction, judgment, insight, memory, and thought process; "normal" speech; "well groomed," "fully oriented" presentation; no delusions, hallucinations, or impaired self-perception). Dr. Jayne prescribed 20 mg Lexapro, Ritalin, and Atavian as needed for sleep. R. 453. Andrew's symptoms improved within a few weeks, R. 454, and Dr. Jayne continued his medications as originally prescribed, 455, 457, 458. Dr. Jayne's findings on exams during this time were normal, R. 454–55, 457–58, except he noted a "circumstantial" thought process on October 14, 2011, R. 458. Andrew always reported "anxiety," but he denied problems with memory, panic, mood swings, energy, and motivation. R. 454–55, 457–58. He reported problems concentrating at two visits. R. 455, 457.

On December 8, 2011, Andrew told Dr. Jayne that he was "feeling overwhelmed and . . . distracted" after being "shunned" by his church. R. 459. It was "harder to maintain" his mood and get enough sleep. *Id.* On exam, Andrew had a constricted, labile affect and appeared sad and anxious. R. 460. Dr. Jayne's other findings were normal. R. 459–60 ("[a]ppropriate dress and grooming"; "[g]ood eye contact," "[c]ooperative and engaged" behavior; normal speech, motor, perception, and thought content/process; "intact" insight and judgment). Dr. Jayne prescribed 30 mg Lexapro and 0.25 mg Xanax as needed. R. 461. Three weeks later, Andrew reported the Xanax helped. He had "[o]nly a few brief bad spells" and felt "more relaxed." R. 462. He reported "pain," but denied all psychiatric symptoms. *Id.* His mental status exam was normal. R. 462–63. By the spring of 2012, Andrew's anxiety was "mild," R. 468, and his mood was "pretty good" on 20 mg Lexapro and a "[r]are" Xanax, R. 465. Dr. Jayne's exam findings remained normal except for an anxious/depressed mood, R. 465, 469, and constricted/fearful affect, R. 469 (May 2012).

Andrew next saw Dr. Jayne on February 11, 2013. R. 471–73. He was suffering from acute depression with "[n]o ability to handle stress" or "multitask." R. 471. Andrew had tried working at a real estate office, but trying "to answer phones and work at the same time" was a "poor fit" for him. *Id.* He had stopped taking Lexapro "some time" ago. *Id.* Andrew was crying and anxious on exam, but he had good eye contact; normal speech, thought content/processes, and perception; and intact insight and judgment. R. 471–72. Dr. Jayne refilled his medications and recommended that Andrew "get scheduled with counseling." R. 473. On March 11, Andrew felt "better" after restarting Lexapro. R. 474. Andrew explained to Dr. Jayne that he "needs to use strategy to avoid stress" because he "[k]nows he is stress intolerant." *Id.* He also had "[p]roblems being alone" and "[o]verthinking" things. *Id.* Dr. Jayne's findings on exam were mostly normal both at this visit, R. 474–75, and at routine visits through April 1, 2014, R. 480–82, 485–86, 489–90, 492–94. In May 2013, Andrew's symptoms were mixed. His mood was "more stable," and his anxiety was "improving," but he had "[p]roblems going out and fear[ed] criticism." R. 477. He did not take his Lexapro and Xanax consistently. *Id.*; *see also* R. 480, 484, 492. That July, Andrew reported that he "[c]an lock up with anxiety," but his "[r]egular meds help greatly." R. 480. He had "[s]ome mental blocks" and "problems with decision-making." *Id.* In January and April 2014, Andrew was generally "[d]oing well" taking Lexapro once a day. R. 488, 492.

After his DLI, on June 24, 2014, Andrew reported a "wild 6 weeks" dealing with physical pain and moving into a new house. R. 496. He was "fearful of [his] physical symptoms" and "[a]nxious that they [would] never go away." *Id.* On exam, Andrew had an anxious and depressed/sad mood and a "tearful," "intense/serious" affect. R. 497. His "obsessive" thought content reflected "hopelessness," "helplessness," and "fatalis[m]." *Id.* His speech, appearance,

11

behavior, thought process, associations, perception, cognition, judgment, and insight were all normal. *Id.* Andrew reported similar symptoms at a "crisis visit" with Dr. Jayne a few days later. R. 500. On exam, Dr. Jayne observed Andrew had a depressed/sad mood; tearful, intense/serious affect; and "obsessive/ruminative" thought process. R. 500–01. He increased the Lexapro to 30mg and told Andrew that he "need[ed] to be more proactive" about taking Xanax. R. 503.

In July, Andrew was "less overwhelmed and coping better." R. 504. Dr. Jayne's findings on exam were normal at this visit, R. 505–06, but he consistently noted abnormalities in Andrew's mood, affect, and/or thought process at routine visits through July 2016, R. 509, 513, 518, 524, 528–29, 631, 643, 656, 663, 674, 690, 707. Andrew often reported "high sensitivity" and "high reactivity to stress/feedback," lack of motivation, chronic social phobia, and insecurity. R. 504, 508, 512, 517, 522, 527, 630, 642, 655, 662, 673. When describing his anxiety, Andrew said "stress set[] him off easily," R. 508; he "got wound up" over "small things," R. 662; he needed to "stay in his comfort zone with activity and must get back to a structured home base," R. 655; he had "some compulsiveness and some rigidity with rituals," *id.*; he was "sensitiv[e] to stimuli" and did "not have a good filter," *id.*; he tended to "react poorly to unpredictable things," R. 522; *see* R. 542–43; he needed "help with planning and organization," R. 630; *see* R. 500; and he had to "be careful in [his] approach to stress" and "strategic in structuring his activities," R. 642. In October 2014, Andrew told Dr. Jayne that he did "OK" when he was "not doing anything stressful." R. 512. He still had "[s]ocial phobia and problems being alone." *Id.*

On October 10, 2014, Andrew started cognitive behavior therapy ("CBT") with Carolyn Marion, a licensed professional counselor who worked with Dr. Jayne at Augusta Psychological Associates. *See* R. 532–37. Andrew reported "a significant history of generalized anxiety

12

disorder adding to a predisposition for PTSD." R. 532. He had experienced PTSD symptoms "for an extended period" after his March 2011 car accident, which "'brought to the fore'" underlying anxiety and ineffective coping skills, especially in the workplace. *Id.*; *see also* R. 548, 553 (Jan. 2015); R. 557–58 (Feb. 2015). Most of Andrew's OCD symptoms (feeling contaminated, ritualistic cleaning, unusual rigid habits, mint osmophobia) were controlled with treatment. R. 538; *see* R. 546–47, 551, 554. He endorsed a history of panic attacks, "major depressive episodes," "persistent/excessive worry," and problems with memory and distraction. R. 532–33; *see also* R. 552–53. On exam, Ms. Marion observed that Andrew appeared sad, tearful, anxious, ashamed, embarrassed, and dysphoric. R. 536. He also had a tangential thought process. *Id.* The rest of his exam was normal. *See* R. 535–37.

Andrew saw Ms. Marion at least two hours each month for "CBT, supportive psychotherapy, and exposure therapy" sessions through mid-July 2016. *See generally* R. 538–70, 621–29, 634–41, 647–54, 659–61, 666–72, 678–88, 694–703, 711–12. Ms. Marion always noted that Andrew was fearful, anxious, or tearful during their visits. *See, e.g.*, R. 540, 542, 544, 546, 559, 552, 555, 557, 559, 561–62, 567, 569, 659–60, 667, 669, 678, 681, 684, 687, 695, 697, 700. She also noted circumstantial and/or tangential thought process, R. 540, 542, 544, 546, 559, 550, 552, 555, 660, 667, 671, 679, 684, 687, 695, 697, 700; perseverative thought content, R. 550, 553, 555; impaired remote memory, R. 551, poor impulse control with rapid/pressured speech, R. 687, 695; and impaired attention and concentration, R. 553. Her treatment notes record Andrew's gradual progress recognizing "the limitations he is under due to his mental illness – anxiety," R. 540; *see, e.g.*, R. 538, 541, 543, 458, 551, 553, 569–70, 701, and efforts to be more independent at home and in the community, *see, e.g.*, R. 537–39, 544–45, 547, 558, 560–62, 570, 624, 659, 667, 671, 695, 706. On May 25, 2015, for example, Ms. Marion and Andrew

13

"processed how he has limited insight into his ability to handle increased loads. Although he becomes eager to take on more, he finds that he gets too easily overwhelmed and then regresses." R. 622. "He considered that he may not always understand what is being asked of him and may sometimes misinterpret what is said" in a workplace setting. *Id.* Andrew needed to "work on taking smaller steps so that he does not self-sabotage and can be more successful for the long term." *Id.* In June 2015, Andrew told Dr. Jayne that he was volunteering at his local library for six hours a week. R. 630. During a session with Ms. Marion that July, Andrew expressed "annoyance" that his family had taken care of him "for years" without him even realizing it. R. 637. "He didn't think that he needed the extra intervention by others to keep [him] from having problems." *Id.*

By January 2016, Andrew was "able to stay for a week" in his own home. R. 671. That March, he found someplace where he could "work on being outside his home . . . in a pseudo work environment to help him make steps toward being back in a real office." R. 685. Ms. Marion suggested that Andrew "hold off . . . until he clarifies a few more questions about the noise level[s] at [different] times of the day." *Id.* (spelling corrected). Andrew agreed. *Id.* In May 2016, Andrew was still working towards being productive during the day and "feeling good enough and confident in himself . . . in all situations." R. 698. "He was proud that he had moved a chair to his room" at his parents' house so he could have a quiet space to read. *Id.*

\* \*

Joseph Leizer, Ph.D., and Howard Leizer, Ph.D., reviewed Andrew's records for the state agency in January 2015 and July 2015, respectively. *See* R. 88–100, 102–15. Both opined that Andrew's severe affective and anxiety-related disorders caused "mild" restrictions in his activities of daily living and "moderate difficulties" in social functioning and maintaining concentration, persistence, or pace. R. 93, 108. He did not have any limitations on understanding,

14

memory, or adaptation before March 31, 2014. *See* R. 96–98, 111–113 (citing R. 331–32). His depression and anxiety caused "mild to moderate limitations," R. 93, in his social interaction and ability to pay attention and stay on task, R. 96–97. *See* 111–12. Nonetheless, Andrew could "maintain concentration and attention for two-hour periods" throughout an eight-hour day; "interact appropriately with supervisors and coworkers" to finish required duties, but would do better "in a setting with only a few co-workers in a well-spaced location"; "interact with the public for brief periods of time"; "complete a normal workweek. . . with minimal need for accommodations on an infrequent basis"; and "perform at least simple, unskilled work." R. 97–98; *see* R. 111–12.

On April 19, 2015, Dr. Jayne completed a Mental Status Evaluation Form for the state agency. R. 445–49. He opined that Andrew was "very sensitive and becomes labile," suffered "intermittent flares of phobic concerns," could "be intensely conflicted and neurotic," and was prone to "brief impulses [of] self-harm when overwhelmed." R. 445. "Obsessive negative thinking ha[d] impaired [his] function." *Id.* Andrew did not "like to be alone, but his anxiety ma[de] it difficult for him to go places." R. 446. Once out in public, he could "manage unless he [was] in close quarters w[ith] large numbers of people." *Id.* Dr. Jayne also compared Andrew's functioning "premorbid," or before his March 2011 car accident, to his functioning (from a psychiatric standpoint) after that event. *See* R. 446–48. Before March 2011, Andrew's "anxiety and attention issues" were controlled with treatment and he was "doing well" handling a full-time job. R. 446. After the accident, Andrew exhibited "more brain fog, lower confidence, . . . increased frustration," and "tangential" thought processes when "trying to express a thought completely." R. 447. His mood "lability increased significantly." *Id.* Andrew had always been "analytical and tend[ed] to perseverate," but after the accident he also exhibited "more struggle

15

to retrieve and organize [his] thoughts." *Id.* Now he got "bewildered" and had "to start and stop to get things to connect in part due to brain fog." R. 448. Andrew's ability to pay attention and complete tasks "depend[ed] on the emotionality of the task. The more emotionally challeng[ing,] the more difficult" it was to complete. *Id.* His memory was "pretty scant," best. R. 447 ("Not good w/ immediate."). Andrew also had "significant anxiety" about driving and needed "reduced hours" if he returned to work. *Id.*

B.   *The ALJ's Decision*

ALJ O'Hara considered Andrew's mental impairments, symptoms, and alleged functional limitations throughout his written decision. *See* R. 20, 22–23, 27–34. He "question[ed]" whether Andrew's "anxiety and affective disorders" qualified as "severe impairments" through March 31, 2014, but he resolved that threshold issue in Andrew's favor. R. 20–21. At step three, ALJ O'Hara "agree[d] with the DDS psychologists" that Andrew did not have a "listing-level mental impairment," R. 22, but found Andrew had "no more than moderate difficulties" with social functioning and maintaining concertation, persistence, or pace. R. 22–23. The ALJ's slightly less severe paragraph B ratings relied entirely on statements Andrew made in 2015–2016 to support his disability claim. *See id.* (citing R. 245–46, 264, 285–87). He did not make any findings about the paragraph A medical criteria. *See id.*

Turning to Andrew's RFC, ALJ O'Hara summarized Andrew's and his mother's statements to the agency, R. 24–25; some of the relevant psychiatric treatment records and exam findings, R. 27–30; and the medical opinions about Andrew's work-related restrictions, R. 33–34. His decision included a detailed and accurate summary of treatment records dated April 2011 through March 2014, R. 27–30, and several reasons why Andrew's and his mother's statements "regarding the severity" of his psychiatric symptoms and limitations were "not consistent with

16

the longitudinal record as a whole," R. 25; *see* R. 30–34. His discussion of "the longitudinal record" omitted nearly all of Andrew's mental-health treatment after April 1, 2014. *See* R. 27–33. However, the ALJ did cite several of Andrew's statements to Dr. Jayne and Ms. Marion to support his finding that Andrew's severe anxiety disorder was not as debilitating as he alleged. *See* R. 31–32 (citing R. 508, 542, 517, 544, 566).

Next, ALJ O'Hara found that Dr. Jayne's April 2015 assessment was "generally consistent the other evidence of record, including his own treatment notes, to warrant the social limitations" in the ALJ's RFC finding. R. 34. He "generally adopted" the DDS psychologists' opinions of what Andrew was "at least capable of through" his DLI because they were "not inconsistent with the other credible evidence of record, including treatment notes." R. 34. The ALJ's RFC finding incorporates aspects of all three opinions: through March 31, 2014, Andrew "retained the concentration, persistence, and pace to perform simple repetitive tasks that [did] not require working with the public" and involved "working with things" more than people. R. 24; *see* R. 30. It appears that the ALJ concluded Dr. Jayne's medical opinion was consistent with this RFC finding. *See* R. 34 ("No treating or examining medical source has opined that [Andrew] is more limited than the above [RFC]."). ALJ O'Hara did not mention Dr. Jayne's opinion that Andrew needed "reduced hours." R. 448.

C. *Analysis*

"A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford*, 734 F.3d at 295 (internal citation omitted). The ALJ does not need to discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski*

17

*v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). "Otherwise, it is impossible for a reviewing court to tell," *Golembiewski*, 322 F.3d at 917, whether the decision "was based on the entire record and supported by substantial evidence," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Here, ALJ O'Hara's decision "contains too little logical explanation" about whether, and if so, how he "weighed significant evidence related to [Andrew's] mental-health treatment," *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019), and specific symptom-related functional limitations identified by Andrew, his mother, Dr. Jayne, and Ms. Marion. Because I "cannot gauge the propriety" of the ALJ's disability determination, "[I] cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

Andrew submitted two years' worth of mental-health records created after his insured-status expired on March 31, 2014. ALJ O'Hara's "passing references," *Abernathy v. Astrue*, No. 4:08cv99, 2009 WL 1578533, at *2 (E.D.N.C. June 3, 2009), to some of those records suggests that the ALJ thought this evidence "permit[ted] an inference between" Andrew's "post-DLI state of health" and his "pre-DLI condition," *Bird*, 699 F.3d at 340, which the ALJ concluded was not disabling. *See Schilling v. Colvin*, No. 7:11cv176, 2013 WL 1246772, at *4 (E.D.N.C. Mar. 26, 2013). But, ALJ O'Hara only cited select portions of those records, and he did not mention any of Dr. Jayne's or Ms. Marion's exam findings or opinions about Andrew's symptoms and limitations. *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability

while ignoring evidence that points to a disability finding." (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Many of those records placed Andrew's anxiety and OCD "symptoms in the context of his work and social histories, drawing a link between his current condition and his condition predating his DLI," *Bird*, 699 F.3d at 342. *See, e.g.*, R. 496–97, 504, 508, 512, 517, 522, 527, 532–33, 537–39, 544–45, 547, 558, 560–62, 570, 622, 624, 659, 667, 671, 695, 706. Thus, that evidence was "relevant," *Parker*, 733 F. App'x at 687 (citing *Bird*, 699 F.3d at 340–41), and ALJ O'Hara needed to "explicitly indicate the weight given" to it and all other relevant evidence in Andrew's record, *Hasty v. Colvin*, No. 7:13cv232, 2015 WL 400577, at *9 (E.D.N.C. Jan. 28, 2015) (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)). His failure to do so in this case was reversible legal error. *See Bird*, 699 F.3d at 342; *Hasty*, 2015 WL 400577, at *9; *Schilling*, 2013 WL 1246772, at *4, *7; *Abernathy*, 2009 WL 1578533, at *2–4.

\* \* \*

I take no position on whether Andrew was disabled before March 31, 2014. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, if Andrew cannot prove he was disabled under Listing 12.06, provide a logical link between the evidence he found credible and the RFC determination. Additionally, although Andrew did not raise this issue in his brief, I expect the next ALJ's written decision will include a thorough and individualized analysis of Andrew's "mental illness . . . [and] adverse responses to seemingly trivial circumstances" and work-place stress. SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985). "Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty [Andrew] will have in meeting the demands of the job." *Id.* If the next ALJ finds that Andrew's stress response limits his work-related functioning, those limitations "must be reflected in the RFC

assessment." *Id.*

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 15, **REVERSE** the Commissioner's final decision, **REMAND** the matter for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 30, 2019

Joel C. Hoppe
United States Magistrate Judge